(199 P.3d 167)
No. 97,457

STATE OF KANSAS, *Appellee*, v. RICHARD SHADDEN, *Appellant*.

Opinion filed January 16, 2009.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, for the appellant.

*Steven J. Obermeier*, assistant district attorney, *Phill Kline*, district attorney, and *Stephen N. Six*, attorney general, for the appellee.

Before STANDRIDGE, P.J., PIERRON and GREEN, JJ.

PIERRON, J.: Richard Dale Shadden appeals his conviction and sentence for driving under the influence of alcohol (DUI). Shad-

den challenges several rulings by the district court and alleges prosecutorial misconduct. We find the admission of the testimony by an arresting officer that there was a 68% likelihood that Shadden was under the influence to an unlawful degree was scientific opinion that was not properly supported by expert testimony. We reverse and remand with directions.

On December 27, 2005, Officers Nick Weiler and Shannon Goodnight received a citizen complaint. Following the directions and descriptions of the reporting citizens, the officers located a truck loaded with pallets in the Town Center parking lot in Merriam, Kansas. As the officers observed the truck, the driver went through a stop sign, causing another vehicle to stop quickly to avoid an accident. The officers pulled behind the truck as it waited for a signal light at Antioch Road and activated the emergency lights after the truck had passed through the intersection. The truck turned onto a side street and stopped in the middle of the lane of traffic close to the intersection. The officers pulled up directly behind the truck.

Weiler approached the driver, later identified as Shadden, and asked for his driver's license and proof of insurance. Shadden was unable to provide a license or proof of insurance, but he provided the automobile registration. Weiler detected a strong odor of alcohol from Shadden and requested Shadden to step out of the vehicle. The smell of alcohol persisted after Shadden emerged from the vehicle. Shadden slurred some of his words and had difficulty communicating, frequently pausing and asking Weiler to repeat his questions. Shadden's eyes were bloodshot and watery and his face appeared flushed.

Weiler asked Shadden to perform some field sobriety tests and directed him to the rear of the truck. Shadden swayed as he walked. Because Weiler was required to pull his car close to the truck, the space between the vehicles did not accommodate the tests. Therefore, Weiler conducted the tests next to the vehicles, and the patrol car's video camera was unable to record Shadden's performance.

Weiler requested that Shadden perform the walk-and-turn test, and, after Weiler instructed Shadden and demonstrated the test, Shadden attempted to perform the test. Because the street pro-

vided no actual line, Weiler advised Shadden to imagine a line for purposes of the field sobriety test. Based on standards promulgated by the National Highway Traffic Safety Administration (NHTSA), Weiler was trained to look for eight possible clues of intoxication based upon an individual's performance of the walk-and-turn test. If an individual demonstrates two or more clues, the individual is deemed to have failed the test.

As Shadden performed the test, Weiler noted that Shadden failed to maintain balance during the instructions and began the test before Weiler had instructed him to begin. During the first nine steps, Shadden stopped once, stepped sideways once, raised his arms twice, and failed to place the heel of one foot against the toe of the other foot on four occasions. When turning, Shadden stepped outside the acceptable range of motion. On the final nine steps, Shadden stopped twice, stepped sideways twice, raised his arms five times, and failed to place his heel against his toe five times. Because of these errors, Weiler claimed he identified all eight clues of intoxication.

Weiler had planned to conduct the one-leg stand test, but, because of the grade of the street, he opted not to conduct this test. Goodnight then conducted three nonstandardized sobriety tests: the alphabet test, a counting test, and the finger-to-nose test. Shadden was unable to recite the alphabet from A to Z without mistake. Shadden counted to 15 correctly but repeated a few numbers when counting back down to 1. In six attempts, Shadden failed to touch his nose correctly during the finger-to-nose test.

Weiler arrested Shadden for DUI. At the police station, Weiler provided Shadden with the implied consent advisory form (DC-27), which included a warning that a test refusal may be used against the individual in a trial for DUI. Weiler then requested that Shadden submit to a breath test on the Intoxilyzer 5000. Shadden refused the test. Weiler read Shadden his *Miranda* warnings, and Shadden waived his rights and spoke with Weiler. Weiler asked how much Shadden had to drink that evening, and Shadden not only informed Weiler he had consumed 3-4 beers, he also stated he had smoked marijuana.

The State charged Shadden with operating or attempting to operate a vehicle while under the influence of alcohol to an extent that it rendered him incapable of safely driving a vehicle, in violation of K.S.A. 2005 Supp. 8-1567(a)(3). Following a 2-day trial, a jury found Shadden guilty of DUI. For purposes of sentencing, the district court found that Shadden had three prior DUI convictions. The court imposed a sentence of 1 year in jail and a fine of $2,500. The court also imposed court costs, BIDS attorney fees, and a requirement of 12 months of substance abuse treatment upon release from jail.

Prior to trial, Shadden filed a motion in limine seeking to exclude any testimony referring to the field sobriety exercises as "tests," indicating that he had failed such exercises, or lending scientific credibility to the results of the exercises. At the hearing regarding the motion, the district court denied the request without much discussion. On appeal, Shadden contends the court's ruling on this issue was erroneous.

Appellate review of a district court's decision concerning a motion in limine has traditionally been limited to determining whether judicial discretion has been abused. *State v. Oliver*, 280 Kan. 681, 693, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006). However, since a motion in limine involves the admission or exclusion of evidence, our review of the district court's exercise of discretion must necessarily be framed by our standard of review regarding the admission of evidence.

When reviewing a district court's decision to admit or exclude evidence, an appellate court first determines whether the evidence is relevant. Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). An appellate court has unlimited review over questions of the materiality of evidence, but a district court's decision regarding the probative value of the evidence is reviewed for an abuse of discretion. *State v. Reid*, 286 Kan. 494, 503-09, 186 P.3d 713 (2008). Once relevance is established, appellate review regarding an evidentiary ruling depends upon the contours of the evidentiary rules governing admission and exclusion of evidence. When the legal basis for the admission or exclusion of evidence is challenged, an appellate court

possesses unlimited review. See 286 Kan. at 503. Even if evidence is admissible under the pertinent evidentiary rules, a district court must determine whether the evidence is unduly prejudicial, a determination that is subject to the abuse of discretion standard of review. 286 Kan. at 512.

Shadden does not challenge the relevance of the field sobriety tests administered in this case. Clearly, a driver's performance on tests designed to gauge sobriety are relevant to determining whether the driver was capable of safely driving a vehicle. Shadden concedes that officer testimony related to his performance on the tests was admissible; however, he argues that testimony regarding the results of the tests, *i.e.*, whether he passed or failed the tests, or reference to the tests, was unfairly prejudicial.

As the State notes, Kansas courts have consistently referred to field sobriety exercises as "tests" and have described an individual's performances on such tests as "passing" or "failing." See, *e.g.*, *State v. Stevens*, 285 Kan. 307, 319, 172 P.3d 570 (2007) (finding DUI conviction was supported by evidence that defendant "was unable to satisfactorily complete the field sobriety tests"); *Bruch v. Kansas Dept. of Revenue*, 282 Kan. 764, 765, 148 P.3d 538 (2006) (noting that Bruch technically *passed* the field sobriety *tests*); *State v. Martinez*, 268 Kan. 21, 24, 988 P.2d 735 (1999) (discussing Martinez' failure on the field sobriety *tests*); *State v. Neuman*, 266 Kan. 319, 320, 970 P.2d 988 (1998) ("Field sobriety tests were administered and defendant failed the tests. He also failed a breath test."); *City of Dodge City v. Norton*, 262 Kan. 199, 204-05, 936 P.2d 1356 (1997) (discussing the validity of a field sobriety test as a clue to physical impairment); *State v. Shaw*, 37 Kan. App. 2d 485, 487, 154 P.3d 524, *rev. denied* 284 Kan. 950 (2007) (summarizing officer's testimony that Shaw *failed* the walk-and-turn test by exhibiting four of eight clues); *City of Dodge City v. Ingram*, 33 Kan. App. 2d 829, 831, 109 P.3d 1272 (2005) (discussing Ingram's *failure* on the alphabet test, the walk-and-turn test, and the one-legged balance test).

However, none of the cited cases specifically addressed the issue raised by Shadden in this appeal. Shadden's argument rests pri-

marily upon a decision by a Florida District Court of Appeal, *State v. Meador*, 674 So. 2d 826 (Fla. Dist. App. 1996).

In *Meador*, the State appealed the suppression of all evidence related to Meador's performance of field sobriety tests. The *Meador* court initially distinguished between psychomotor field sobriety tests, which involved observations of a driver's attempts to perform certain tasks, and horizontal gaze nystagmus (HGN) tests, which involved observations of a physiological phenomenon associated with intoxication. We note below that Kansas does not allow the introduction of the HGN test results to prove intoxication. Citing *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992), with approval, the *Meador* court noted that the HGN test required expert testimony to establish its probative value because an officer could relate his or her observations about a driver's physiological condition but the correlation between the condition and alcohol impairment is premised upon scientific principles. 674 So. 2d at 834. In contrast, the correlation between a driver's inability to perform psychomotor field sobriety tests and that driver's inability to operate safely a motor vehicle is within the average juror's common experiences and understanding. 674 So. 2d at 831. Therefore, while expert testimony that satisfies the standard of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), must be admitted to establish a driver's performance of the HGN test, lay testimony is satisfactory for psychomotor field sobriety tests.

However, the *Meador* court limited the admissibility of psychomotor field sobriety tests to the officer's observations of the driver's performance during the tests.

"While the psychomotor tests are admissible, we agree with defendants that any attempt to attach significance to defendants' performance on these exercises beyond that attributable to any of the other observations of a defendant's conduct at the time of the arrest could be misleading to the jury and thus tip the scales so that the danger of unfair prejudice would outweigh its probative value. The likelihood of unfair prejudice does not outweigh the probative value as long as the witnesses simply describe their observations. [Citation omitted.]

"Reference to the exercises by using terms such as 'test,' 'pass,' 'fail,' or 'points,' however, creates a potential for enhancing the significance of the observations in relationship to the ultimate determination of impairment, as such terms give these layperson observations an aura of scientific validity. [Citations omitted.] There-

fore, such terms should be avoided to minimize the danger that the jury will attach greater significance to the results of the field sobriety exercises than to other lay observations of impairment." 674 So. 2d at 832-33.

Though the *Meador* decision implies that the use of "test," "pass," "fail," or "points" with reference to field sobriety tests causes prejudice to a criminal defendant, the context of the court's reasoning suggests that the prejudice lies not in semantics but in any purported scientific or mathematical correlation between a driver's performance during field sobriety tests and a certain level of intoxication. See *United States v. Horn*, 185 F. Supp. 2d 530, 558-60 (D. Md. 2002) (adopting the *Meador* reasoning to limit the type of testimony concerning a driver's performance on a field sobriety test the State may elicit because it lends undeserved scientific credibility to an officer's testimony).

The issue raised by Shadden and addressed by the Florida court is one of first impression in this jurisdiction. Extensive research has revealed only three Kansas cases involving the admissibility of field sobriety tests: *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998); *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992); and *State v. McHenry*, No. 93,872, unpublished opinion filed June 30, 2006. Although none of the cases directly address the issue presented in this appeal, two of the cases provide some guidance about the manner in which Kansas courts have previously addressed challenges to testimony by officers who have conducted field sobriety tests.

In *Witte*, the Kansas Supreme Court provided an extensive analysis of the positions other jurisdictions had taken with respect to the admission of HGN test results. The court first considered whether the HGN test results involved scientific evidence requiring expert testimony that qualified under *Frye*. *Witte*, 251 Kan. at 318-22. The *Witte* court summarized the reasons other jurisdictions had concluded that the HGN test was scientific in nature in the following manner:

"These courts have given various reasons for holding that HGN evidence is scientific in nature: The HGN test is distinguished from other field sobriety tests in that science, rather than common knowledge, provides the legitimacy for HGN testing. [Citations omitted.] Certain reactions to alcohol are so common that judicial notice will be taken of them; however, HGN testing does not fall into this

category. [Citation omitted.] HGN test results are 'scientific evidence based on the scientific principle that consumption of alcohol causes the type of nystagmus measured by the HGN test.' [Citation omitted.] HGN evidence could have a disproportionate impact on the jury's decision making process because of the test's scientific nature and because the jury may not understand the nature of the test or the methodology of its procedure. [Citations omitted.]" 251 Kan. at 321.

The court then concluded:

"Alcohol's effect on a person's sense of balance is common knowledge. The same cannot be said for HGN. The HGN test is based upon scientific principles and exceeds common knowledge. We hold that the HGN test results are scientific evidence. As such, the *Frye* foundation requirements for admissibility must be satisfied." 251 Kan. at 322.

After reviewing cases from multiple jurisdictions that have considered the admissibility of the HGN test, the *Witte* court ultimately concluded that the test results were not reliable enough to meet the requirements of *Frye. Witte*, 251 Kan. at 329-30. While *Witte* did not address the admissibility of other field sobriety tests, the decision implies that the results of field sobriety tests based upon common knowledge of the effects of alcohol, such as poor balance, would be admissible irrespective of *Frye.*

In *McHenry*, a panel of this court considered whether the 12-step drug recognition examiner (DRE) protocol required demonstration of reliability under *Frye.* The *McHenry* court specifically noted that the district court restricted the arresting officer's testimony to discussions of the kinds of symptoms different drugs produce and the symptoms the officer observed in McHenry. In rejecting McHenry's argument that the officer's testimony implied scientific evidence that was not demonstrably reliable under *Frye*, this court quoted *Williams v. State*, 710 So. 2d 24 (Fla. Dist. App. 1998), at length. In essence, the *McHenry* court concluded that the testimony of the officer who conducted the DRE protocol was admissible outside of *Frye* because the testimony related to physiological conditions within the common knowledge of the jurors.

" 'Police officers and lay witnesses have long been permitted to testify as to their observations of a defendant's acts, conduct, and appearance, and also to give an opinion on the defendant's state of impairment based on those observations. [Citations omitted.] Objective observations based on observable signs and condi-

tions are not classified as "scientific" and thus constitute admissible testimony.'" *McHenry*, slip op. at 17 (quoting *Williams*, 710 So. 2d at 28-29).

*Implicit* in *Witte* and *McHenry* is the prohibition against the admission of evidence regarding field sobriety tests that is beyond the common knowledge of lay persons, unless the evidence is shown to be reliable under *Frye*. In other jurisdictions, this prohibition has extended to the use for which field sobriety test results are admitted. Most jurisdictions that have considered the question have admitted field sobriety test results as circumstantial evidence of intoxication but have prohibited the use of such results to assert or imply a specific level of intoxication. See, *e.g.*, *Ballard v. State*, 955 P.2d 931, 940 (Alaska App. 1998), *overruled on other grounds State v. Coon*, 974 P.2d 386 (Alaska 1999) (concluding that HGN test results are admissible as circumstantial evidence of intoxication but inadmissible to establish a particular blood-alcohol concentration [BAC] level); *State v. Campoy*, 214 Ariz. 132, 134-35, 149 P.3d 756 (Ariz. App. 2006) (same); *People v. Rose*, 268 Ill. App. 3d 174, 181, 643 N.E.2d 865 (1994) (distinguishing between the admission of field sobriety test results and preliminary breath test results because the breath test registered body chemistry rather than recording behavioral characteristics); *Schmidt v. State*, 816 N.E.2d 925, 946 (Ind. App. 2004) (suggesting that admission of evidence regarding statistical probability that an individual who failed a field sobriety test would have a BAC over .10 is improper in the State's case-in-chief); *Wilson v. State*, 124 Md. App. 543, 553, 723 A.2d 494 (1999) (permitting testimony regarding HGN test results but finding error when testimony included an opinion that Wilson was at or above .10 BAC); *State v. Rose*, 86 S.W.3d 90, 100 (Mo. App. 2002) (allowing evidence of HGN test results as circumstantial evidence of intoxication but not as evidence of a specific BAC level); *State v. Baue*, 258 Neb. 968, 985-87, 607 N.W.2d 191 (2000) (same); *State v. Dahood*, 148 N.H. 723, 734, 814 A.2d 159 (2002) (same); *Brewer v. Ziegler*, 743 N.W.2d 391, 400 (N.D. 2007) (admitting evidence of HGN test results as circumstantial evidence of intoxication but not as evidence of a specific BAC level); *State v. Sullivan*, 426 S.E.2d 766, 769 (S.C. 1993) (same); *Emerson v. State*,

880 S.W.2d 759, 769 (Tex. Crim.), *cert. denied* 513 U.S. 931 (1994) (same).

Nevertheless, not all courts have limited testimony regarding field sobriety tests as far as the *Meador* and *Horn* courts. In *Campoy*, the State appealed a district court's decision to prohibit the arresting officer from referring to " 'sobriety,' " " 'test,' " " 'field sobriety test,' " " 'impairment,' " " 'pass,' " " 'fail,' " or " 'marginal' " in describing the driver's performance on field sobriety tests because such language added unwarranted scientific credibility to the State's evidence. 214 Ariz. at 134.

Reversing the district court, the *Campoy* court first noted that the results of field sobriety tests (FSTs) are admissible as evidence of a criminal defendant's general impairment but not admissible to establish a specific level of blood-alcohol concentration (BAC). 214 Ariz. at 134-35.

"Within this framework of admissibility, we find no support for the restrictions the respondent judge [Hector Campoy] imposed. Rather, it is clear Arizona law permits testimony about a defendant's performance on FSTs as long as no correlation is made between performance and BAC and no scientific validity is assigned to the tests themselves as accurate measures of BAC. FST performance has repeatedly been found to be relevant evidence of a defendant's impairment; thus, we disagree with the respondent's implicit conclusion to the contrary. [Citations omitted.]

"Moreover, the words the respondent precluded are pervasive throughout the case law concerning FSTs and have not been found, or even suggested to be, inadmissible. The danger our courts have attempted to guard against is using FST performance to estimate or quantify a specific BAC or level of impairment for prosecutions . . . in which the state must prove the defendant had a specific BAC. That danger is much attenuated in prosecutions . . . where the state need only prove impairment to the slightest degree—though we realize BAC is relevant to such prosecutions and reiterate FST performance is inadmissible to quantify BAC in all [DUI] prosecutions . . . .

"The respondent judge ordered the restrictions based on his finding there is no scientific correlation between impairment and performance on FSTs, a finding in turn based on expert testimony that several factors other than alcohol impairment can lead to a cue of impairment on an FST. Our supreme court has indicated, however, that expert testimony goes to the weight to be given FST evidence, not its admissibility or relevance at trial. [Citation omitted.] Furthermore, although we generally defer to a respondent judge's factual findings, the respondent's conclusion here is not supported by the evidence. [Citation omitted.] The

mere self-evident fact that circumstances other than alcohol impairment can be responsible for cues of impairment on FSTs does not establish that such tests are necessarily uncorrelated with impairment. Indeed, our courts have repeatedly found FSTs are tests of impairment, albeit not definitive indicators of such, and police officers should be permitted to testify accordingly. [Citations omitted.] And the words at issue in this case do not in themselves suggest a scientific basis for the tests or lend the tests unwarranted scientific credibility. Rather, they make plain the tests' purpose as indicators of impairment and enable the state to demonstrate their probative value. Testimony that a defendant exhibited 'four cues of impairment' on a 'field sobriety test' does not improperly assert or imply the defendant has been scientifically *proven* to have been impaired. Rather, such testimony constitutes relevant evidence of a defendant's impairment, which jurors may consider and balance against evidence of the tests' limitations.

"Thus, the proper method for challenging FST deficiencies is testimony, such as that of [defendant] Cordova's expert at the pretrial hearing, calling these deficiencies to the attention of the jury and presenting evidence that cues of impairment were caused by something other than alcohol impairment. If, during trial, Cordova believes the state has attempted to assign unwarranted scientific credibility to the tests, e.g., the state has used their results to establish a specific BAC or as a definitive indicator of impairment, Cordova can object at that time. The respondent judge would then have the appropriate context in which to determine whether the state had improperly used the FST performance evidence.

"Additionally, permitting restrictions on vocabulary in DUI cases such as the respondent imposed here would open the door to creative wordsmithing and invite perpetual and unnecessary litigation. A considerable amount of time could be spent determining which words accurately describe FSTs and portray FST performance. Would a law enforcement officer be permitted to testify he or she had administered a 'field incapacitation examination'? And that the officer had detected two cues of 'deficient performance'? Without use of certain words, testimony could take an unnatural tone as witnesses attempt to sidestep prohibited terms. Such restrictions would place an unnecessary burden on both parties and would be transparent to the jury. [Citation omitted.]" 214 Ariz. at 135-36.

The reasoning of the Arizona court seems more persuasive than that of the *Meador* and *Horn* courts. The danger inherent in officer testimony that establishes a correlation between a driver's performance during a given field sobriety test and a specific level of intoxication is the possibility that the jury will give the test results undeserved weight as "scientific evidence" when the reliability of the test results has not been established under *Frye*. While a lack of balance and glassy eyes are commonly known indicators of intoxication, the correlation between test performance and a specific

level of intoxication is not within the common knowledge of the average layperson.

In contrast, where officer testimony does not link test performance with a specific level of intoxication, the mere use of the term "test" or an indication by the officer that the defendant failed to perform the tests adequately and, therefore, "failed" the test does not lend scientific credibility to the test results. There is only a semantic difference between "field sobriety test" and "field sobriety exercise" or between "failing a test" and "being unable to perform an exercise adequately." An officer must be permitted to relate the activities a suspected drunk driver was asked to perform and to indicate that certain deficiencies in the performance of these activities indicated that the driver was intoxicated. A juror is not likely to mistake the purpose of a driver standing in the street on one foot while counting to 30 or walking heel-to-toe for 18 steps on a straight line after being stopped by a law enforcement officer. To this end, it is appropriate for the officer to testify that field sobriety tests were administered and that, based upon the officer's training and experience, the driver failed those tests. It is impermissible to take the additional step of equating a level of certainty or probability to the officer's opinion or to correlate a driver's performance with a specific BAC level.

In the present case, Officer Weiler's testimony went beyond an indication that Shadden attempted to perform certain field sobriety tests and demonstrated multiple clues of intoxication. Weiler also testified that, according to NHTSA standards, a driver who exhibits two clues during the walk-and-turn test has a 68% likelihood of having at least a .10 BAC. Weiler clearly was not qualified to testify about the reliability of the NHTSA standards, and no expert testimony was provided to qualify the NHTSA standards under *Frye*. Therefore, Shadden had no effective means of cross-examining the reliability of the NHTSA standards because Weiler was merely relating information promulgated by the NHTSA. The result is the officer's opinion that the criminal defendant is intoxicated is given an undeserved scientific credibility.

"Although [the officer] did not specifically state an opinion that [the defendant's] BAC would have registered at or above .10%, his testimony created a re-

markable inference that such was the case, and we find that the admission of such testimony was an abuse of discretion. A BAC of .10% is not a prerequisite to convicting for DWI. [Citation omitted.] In fact, a jury is still free to conclude that a driver is intoxicated even if the driver's BAC is shown to be less than .10%. [Citation omitted.] 'Intoxication is a physical condition usually evidenced by unsteadiness on the feet, slurring of speech, lack of body coordination and an impairment of motor reflexes.' [Citation omitted.] Inasmuch as [*State v. Hill*, 865 S.W.2d 702 (Mo. App. 1993), *overruled on other grounds State v. Carson*, 941 S.W.2d 518 (Mo. 1997)], though the use of 'linguistic gymnastics' (as characterized by the appellant), suggests that an officer who testifies that, in the officer's experience, persons who score six points on the HGN test also register above .10% on the breathalyzer is not the same as testifying that the individual defendant has a particular blood alcohol content and is properly admissible, we think otherwise and hold that it is an abuse of discretion for a trial court to admit such testimony absent an adequate foundation which establishes the witness' ability to determine that a person's performance on the HGN test represents a BAC in excess of a certain level." *Rose*, 86 S.W.3d at 100-01.

Here, Shadden properly objected to this testimony. Although Missouri obviously admits evidence of the HGN test, whereas Kansas does not, the reasoning in *Rose* is analogous to the evidence presented in Shadden's trial. Officer Weiler's testimony went beyond recounting the tasks Shadden was asked to perform and Weiler's observations of Shadden's attempted performance. Weiler took the additional, impermissible step of implying a level of scientific certainty to the walk-and-turn test results. This was improper.

In *Witte*, the Kansas Supreme Court held that the erroneous admission of the HGN test results could not be held harmless because the later breath test results indicated that Witte possessed a BAC of .103 and the margin of error was unclear. 251 Kan. at 330-31. In the present case, Shadden refused to take a breath test, and the jury's conviction was based entirely upon the interpretation given Shadden's performance during the field sobriety tests. Due to the possibility that the jury placed undue weight upon the field sobriety test results, this court cannot conclude that the error was harmless. See *State v. Murray*, 285 Kan. 503, 535, 174 P.3d 407 (2008) (articulating the harmless error standard).

Therefore, we must reverse and remand for a new trial.

Although our rulings, if given effect, would make the following issues moot, due to the possibility of review we will address the other issues that appear to need resolution.

Shadden next contends that his trial was prejudiced by prosecutorial misconduct. Specifically, Shadden contends the State violated the district court's ruling prohibiting the officers from rendering their opinions regarding Shadden's intoxication.

In reviewing a claim that the State violated an order in limine, the appellate court applies a two-part standard of review that is indistinguishable from the review used to review a claim of prosecutorial misconduct, except a party must object to the inappropriate admission of evidence at trial in order to preserve the objection. See *State v. Fewell*, 286 Kan. 370, 391, 184 P.3d 903 (2008) (citing *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 [2003]); *State v. Albright*, 283 Kan. 418, 426, 153 P.3d 497 (2007) ("[W]hen a defendant alleges prejudice based on reviewing the district court's denial of a mistrial motion based on violations of an in limine order *by the prosecutor*, we have also employed a prosecutorial misconduct-type analysis to the extent it is helpful in determining whether there has been substantial prejudice.").

Where a claim of prosecutorial misconduct involves the improper elicitation of testimony rather than prejudicial remarks in closing argument, an appellate court must first consider whether the questions posed by the prosecutor were impermissible. In this case, the court must decide whether the State's questions violated the district court's order in limine. If so, the reviewing court then determines whether the misconduct constituted plain error. In applying the second prong of the test, the court must consider: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct exhibited ill will toward the defendant by the prosecutor; and (3) whether the misconduct may be deemed harmless in light of the evidence of guilt presented at trial. Where the first two factors weigh against the prosecutor, a reviewing court may find the misconduct harmless only when both the statutory and constitutional harmless error tests are satisfied. *State v. Hunt*, 285 Kan. 855, 871-72, 176 P.3d 183 (2008).

In the present case, the district court held a hearing on the issues raised in Shadden's motion in limine. In discussing Shadden's argument that the arresting officers should be prohibited from rendering an opinion regarding Shadden's impairment, the district court initially commented that the State should address the officers' opinions in terms of their reasons for arresting Shadden. The State then noted that *City of Dodge City v. Hadley*, 262 Kan. 234, 936 P.2d 1347 (1997), and *State v. Carr*, 230 Kan. 322, 634 P.2d 1104 (1981), *overruled on other grounds State v. Cantrell*, 234 Kan. 426, 673 P.2d 1147 (1983), specifically permitted law enforcement to provide opinion testimony concerning the state of intoxication of a criminal defendant. Defense counsel then conceded that the State could elicit testimony from the officers regarding their opinions that Shadden was intoxicated to a point that established probable cause to arrest. The district court then stated, "They reach their opinions based on conduct, field sobriety results, what have you, to arrest him, and to say that, 'Okay. Based on what we saw, what we observed, the results of these tests, we arrested him for DUI.' " After further discussion, the district judge added:

"And I suppose that it is really a question of how you frame your question. If you say, 'Based upon his conduct as well, did that cause you any pause as to whether he was under the influence at the time that you arrested him?' I think that you can reach the same result. But I think that it is a little bit less than just turning to the jury and saying, 'In my expert opinion he was under the influence, members of the jury,' period.

"It needs to be related to the jury in the context of what they were seeing and observing, 'Based upon the arrest of this individual, he was arrested for this behavior and conduct,' that that is why they arrested him. They can relate to that. But I think that everything in the way of their opinions needs to be related to the reasons why they arrested him."

When the State requested clarification of the court's ruling, the district judge added:

"My point simply is this . . . if you are simply going to put an officer on the stand and say, 'You observed him all that night?' 'Yeah, I did.' 'Do you have an opinion for the jury?'

. . . .

"It has to be—what I'm saying, it has to be in the context of what the officers did, why they arrested him . . . they needed to get him off the street, this is why they did it, this, this, this, and this.

. . . .

"I think that you can get in what you are trying to get in if you phrase your question correctly. I'm asking that, if you have any questions ahead of time, you can bounce those off the Court. If you don't want to, you don't have to.

. . . .

"But we may have to approach, we may have to do something outside the presence of the jury. I'm just anticipating that issue. I've had it come up in other cases and it is, I think, better practice for the State to have the officers give their opinions in relation to what they did. That is, they arrested the fellow, they detained him, gave him an Intoxilyzer, whatever they did, to explain what they are doing. That is all fair for the jury to hear and understand.

"But I think that when you just bring in an officer and say, 'Okay. You observed everything; do you have a[n] opinion for the jury?' period, that is a little bit different.

. . . .

"I may be anticipating a problem that won't come up, truthfully, based upon how the questions are presented. I'm just . . . giving you food for thought probably more than anything."

At trial, the State reviewed Weiler's observations of Shadden's performance during the traffic stop and subsequent field sobriety tests before eliciting Weiler's opinion whether Shadden was intoxicated. Although defense counsel objected three times that the State had failed to lay a sufficient foundation to qualify Weiler as an expert on DUI, the district court neither sustained nor overruled the objections, merely directing the State to ask Weiler why he arrested Shadden. The State then approached the question by asking Weiler why Shadden was arrested. When Weiler testified that Shadden was arrested for DUI, the State asked for the basis Weiler used to determine that Shadden had committed DUI and asked whether Weiler believed Shadden was intoxicated. Again, Shadden objected, but the district court overruled the objection.

Despite the ambiguity of the district court's ruling in response to Shadden's motion in limine, the State clearly attempted to comply with the district court's order that the State lay a foundation for Weiler's opinion that Shadden was intoxicated before eliciting that opinion. Contrary to Shadden's argument on appeal, the State did not violate the district court's order in limine regarding Weiler's opinion about Shadden's level of intoxication.

Moreover, even if the district court's ruling could be interpreted, as Shadden suggests, to prohibit opinion testimony regarding Shadden's intoxication, the district court's ruling was not erroneous. An officer who has observed a criminal defendant during a traffic stop may provide a lay opinion concerning whether the defendant was intoxicated at the time of the stop. See *Hadley*, 262 Kan. at 241-42. Consequently, any violation of the court's order in limine did not result in the erroneous admission of evidence that was unfairly prejudicial to Shadden and did not provide a basis for reversing his conviction of DUI.

The officer's testimony concerning the 68% likelihood that Shadden was under the influence, although reversible error in its admission, was not a violation of the motion in limine.

. Shadden additionally contends that the district court improperly permitted the State to elicit testimony regarding Shadden's refusal to take a breath test in violation of Shadden's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Shadden acknowledges that he did not object to the admission of evidence on the grounds he raises in this appeal, but he argues that the issue should be considered for the first time on appeal because the issue involves a question of law on proved or admitted facts and because consideration of the issue is necessary to prevent the denial of fundamental rights.

Even constitutional grounds for appeal must be preserved by a timely and specific objection in the district court. Although an appellate court may reach questions of law that were not properly preserved if necessary to prevent the denial of fundamental rights, Shadden did not believe this issue was significant enough to raise in his motion in limine, in his motion for judgment of acquittal, or in any other manner. Therefore, this court may properly decline to consider the issue for the first time on appeal. *State v. Alger*, 282 Kan. 297, 304, 145 P.3d 12 (2006) (refusing to consider the voluntariness of statements to police for the first time on appeal).

Moreover, even if this court reached the merits of Shadden's claim, precedent of this court clearly establishes that the claim possesses no basis for the relief Shadden requests. See *State v. Wahweotten*, 36 Kan. App. 2d 568, 580-82, 143 P.3d 58 (2006),

*rev. denied* 283 Kan. 933 (2007) (relying on *Pennsylvania v. Muniz*, 496 U.S. 582, 110 L. Ed. 2d 528, 110 S. Ct. 2638 [1990]; *South Dakota v. Neville*, 459 U.S. 553, 74 L. Ed. 2d 748, 103 S. Ct. 916 [1983]). Admission of evidence regarding Shadden's breath test refusal did not violate Shadden's Fifth, Sixth, or Fourteenth Amendment rights.

In a related argument, Shadden further contends that the officers request that Shadden submit to a breath test created an unconstitutional condition by requiring Shadden to choose between a waiver of his Fourth Amendment rights in consenting to a breath test and a waiver of his Fifth Amendment rights by refusing to take the breath test.

Again, this issue was not raised before the district court and is not properly preserved for appellate review. See *Alger*, 282 Kan. at 304. In addition, because the request to submit to a breath test does not impinge upon an individual's freedom from self-incrimination, the request does not create an unconstitutional condition. See *Wahweotten*, 36 Kan. App. 2d at 583. Consequently, this argument also lacks merit.

With regard to the district court's imposition of Board of Indigents' Defense Services (BIDS) attorney fees, Shadden raises two issues. First, he contends that the imposition of any attorney fees under K.S.A. 22-4513 was error without first making findings on the record of his ability to pay such fees. Shadden then contends that the imposition of attorney fees in the journal entry was improper because the imposition of attorney fees was not announced at the sentencing hearing and, therefore, does not constitute an enforceable part of sentencing.

The State contends that any issue regarding the imposition of BIDS attorneys fees is moot because Shadden is no longer subject to the jurisdiction of the State. While the State refers the court to the Kansas Adult Supervision Population Electronic Repository (KASPER) to establish the fact that Shadden was released from State custody in December 2007, this information is not a part of the appellate record and cannot be considered by this court. See *State v. Wright*, 219 Kan. 808, 812, 549 P.2d 958 (1976).

The State accurately notes that at sentencing, on September 14, 2006, Shadden was given 262 days of jail time credit. Therefore, after sentencing Shadden was required to serve the remaining 103 days of his 1-year sentence. Shadden's sentence commenced on December 27, 2005. Shadden was assigned a 12-month postrelease supervision term. Therefore, Shadden should have been released from State custody on December 27, 2007, as the State alleges KASPER demonstrates.

Nevertheless, K.S.A. 22-4513(a) states: "If the defendant is convicted, all expenditures made by [BIDS] . . . shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases." While a district court is entitled to reduce or waive the amount of BIDS attorney fees the defendant is required to reimburse under K.S.A. 22-4513(b), the mandatory language of subsection (a) indicates that, unless the district court makes an affirmative finding and waives the fees, BIDS expenditures will become a civil judgment against the defendant. The State has not demonstrated that the BIDS attorney fees ordered by the court in the present case have not been imposed against Shadden as a civil judgment. Consequently, this court should not dismiss the issue as moot. See *State ex rel. Slusher v. City of Leavenworth*, 285 Kan. 438, 454, 172 P.3d 1154 (2007) ("An appeal will not be dismissed for mootness unless it is clearly and convincingly shown that the actual controversy has ended and the only judgment that could be entered would be ineffectual for any purpose and an idle act insofar as rights involved in the case are concerned.").

In *State v. Robinson*, 281 Kan. 538, Syl. ¶ 1, 132 P.3d 934 (2006), the Kansas Supreme Court held: "A sentencing court assessing fees to reimburse [BIDS] under [K.S.A. 22-4513] must consider on the record at the time of assessment the financial resources of the defendant and the nature of the burden that payment of the fees will impose." The record is silent as to these considerations. Therefore, the BIDS attorney fees imposed pursuant to K.S.A. 22-4513 must be vacated.

In an attempt to prevent the case from returning to the district court, assuming the conviction stands, the State attempts to waive the imposition of attorney fees. However, as the State notes, the

obligation to consider the defendant's financial ability to reimburse BIDS is not the State's but the district court's. K.S.A. 22-4513 is a recoupment statute designed to reimburse State funds expended in a criminal defense. Neither the prosecutor nor the district court possess discretion in the matter of imposing BIDS fees. The district court must order a criminal defendant who has been convicted of a crime to reimburse BIDS for its expenditures, unless the district court takes an affirmative act to waive such fees based on the defendant's financial condition and ability to reimburse BIDS.

While recognizing the frustration inherent in a remand on this issue, this court is bound by the plain language of K.S.A. 22-4513 and *Robinson* to remand the case for reconsideration, on the record, of the BIDS attorney fees imposed.

To the extent that remand under *Robinson* is necessary, Shadden's related argument—that the district court erred in imposing BIDS attorney fees in the journal entry when the fees were not imposed at sentencing—is moot. *State v. Aleman*, 16 Kan. App. 2d 784, 786, 830 P.2d 64, *rev. denied* 251 Kan. 940 (1992) ("An appellate court will not render opinions in appeals which present moot issues or where the judgment could have no practical effect on a then-existing controversy."). Even if the issue were not moot, Shadden's argument regarding the imposition of the BIDS attorney fees for the first time in the journal entry possesses no merit. See *State v. Bale*, 39 Kan. App. 2d 655, 664-65, 182 P.3d 1280, *rev. denied* 286 Kan. 1180 (2008) (holding that K.S.A. 22-4513 is a recoupment statute, not a penalty statute, and a court may impose fees without pronouncing the fees at the sentencing hearing).

We reverse and remand with directions for a new trial.