NOT DESIGNATED FOR PUBLICATION

No. 116,209

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JASON GRASLE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed September 21, 2018. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., BRUNS and GARDNER, JJ.

PER CURIAM: Jason Anthony Grasle appeals from a jury verdict finding him guilty of four counts of aggravated robbery, one count of aggravated burglary, and one count of fleeing or attempting to elude an officer of the law. Grasle claims the district court erred in two significant evidentiary rulings, which prejudiced him. We disagree and affirm.

1

*Factual and procedural background*

Because this is Grasle's direct appeal, we set forth the facts in detail. In September 2012, Grasle saw Mark Dylan Seminara, an acquaintance, at a Dairy Queen and they began a conversation. Seminara lived in Pflumm Oxford House, a structured sober living community in Johnson County, Kansas, with four roommates. During their conversation, Grasle asked Seminara if he was gay. When Seminara said that he was, Grasle replied "that he was not that way but he was cool with it." Over the next few days, Grasle and Seminara exchanged text messages and talked on the phone, sometimes romantically. Grasle told Seminara that he was questioning his sexuality, and when Grasle went to see Seminara at the Oxford House, the two men kissed.

The night of September 15 and into the morning on September 16, an armed robbery occurred at the Pflumm Oxford House, followed by a police chase. How those events unfolded is unclear, though, and the story changes depending on who testified.

The testimony from Deandre Smith, Demetrius Johnson, Seminara, and Seminara's roommates identified Grasle as the orchestrator of the robbery. According to Smith and Johnson, they were playing basketball in Kansas City when Grasle approached them and asked if they were interested in making money. Johnson said yes. Smith, Johnson, and another friend, "A-1" Robinson, later met at a mutual friend's house in Kansas City and Grasle told them of his plan to rob a homosexual man's house, with Grasle portraying himself as gay to set up the robbery.

The four men got into Grasle's car, and Grasle drove them to Taco Bell, a gas station, and a liquor store. Johnson and Smith both testified that on their way to the house they intended to rob, Grasle spoke to Seminara on the phone using a feminine voice. Smith testified that Grasle said "that he was by [himself] and he was coming over to spend the night and that he had some drinks." Grasle downplayed the suggestion that he

2

was faking a feminine voice, explaining that he talks differently to people depending on their background or life experiences.

Grasle arrived at Seminara's neighborhood shortly thereafter. Grasle drove by the Oxford House where Seminara and his roommates lived and pointed it out to Smith, Johnson, and Robinson. Grasle dropped them off a short distance away, said he would leave the door unlocked, and instructed them to wait 5 or 10 minutes before coming over.

Seminara met Grasle at the front door of the Oxford House and led him inside. Seminara started to close the front door but Grasle intervened and closed it himself. Grasle declined Seminara's suggestion that they go to the basement.

Meanwhile, Smith, Johnson, and Robinson walked toward the Oxford House from where Grasle had dropped them off. They were drunk and high. Robinson pulled out two handguns and gave one to Johnson, then the three entered the house through the unlocked front door. Robinson and Johnson went to the kitchen and ordered Seminara and Grasle to the ground while Smith began stealing items. Grasle told Seminara to get down and warned him that the gunmen would shoot them if they moved. Johnson brought one of Seminara's roommates to the kitchen and ordered him to get on the floor. A gunman told Grasle to climb on top of Seminara and "dry hump" him. The gunmen testified that this was Grasle's way of letting the gunmen know which resident was gay. The gunmen repeatedly directed homophobic slurs toward Seminara and the others. After gathering Seminara's other roommates, the gunmen moved the hostages to a bathroom.

Throughout the incident, Grasle was sometimes with Seminara and the other victims and sometimes with the three gunmen. Smith testified that Grasle had told him what items to take, including car tools, a keyboard, toilet paper, a digital keyboard, shoes, an XBox, a television, money, and cell phones. They also took a backpack, Kindle, shoes, and an MP3 player.

3

The gunmen moved the victims a few times during the robbery. While the gunmen moved them to the basement, they ordered Seminara to go downstairs, take off his clothes, get down on his knees, and face the wall in his closet. They took the remaining residents and Grasle to another bathroom.

Smith testified that Grasle was the one who decided it was time to end the robbery and leave. The plan was that while others were in the bathroom, Smith, Robinson, and Johnson would act as if they were taking Grasle to an ATM machine. While being transferred from the bathroom to the basement, one roommate remembered seeing Grasle "laying down on the floor of the garage." But Seminara testified that he saw Grasle "standing face-to-face with one of the black guys" and "could hear a faint whisper and he was having a conversation." He saw no guns pointed at Grasle. Another roommate saw Grasle arguing a little with a gunman and found it odd that the gunmen were not assaulting Grasle like they assaulted the other victim. For example, he noted that the gunmen were threatening them with guns and hitting them, but Grasle was being mouthy and nothing happened to him, even after he disobeyed the gunman's order to be quiet.

The gunmen left with Grasle, saying they were taking him to an ATM, and the residents were concerned. Seminara realized Grasle's car was not in the driveway. One roommate called the police, described Grasle's car, and told them Grasle had been kidnapped. An officer responded to the armed residential robbery call. As he approached the residence, a roommate flagged him down, told him they had been robbed, and said the men had kidnapped Grasle.

Officer Justin Schopfer received a description of the car through his police vehicle dispatch. He saw a vehicle matching the description of the car on I-35, pulled in behind it, and activated his lights and sirens. Grasle left the highway and pulled into an IHOP parking lot but did not stop. Instead, Grasle cut through the parking lot and headed

4

toward a park. He crashed the car through the closed gate at the park's entrance, then drove at about 5 to 10 miles per hour until he struck a tree.

Smith and Johnson testified that Grasle then told the occupants of the car to "get out and run." Robinson tried to flee but Smith, Johnson, and Grasle remained in the vehicle. Smith and Johnson came out of the car with their hands up at the officer's command. Grasle, however, remained in the car, motionless, not responding to any verbal commands from the officers. Schopfer saw no signs of injury on Grasle. Because of how slowly Grasle's vehicle had been moving at the time of the wreck, Schopfer thought that Grasle was faking unconsciousness. Smith testified that Grasle was never unconscious, but that Grasle acted like he had been injured in the accident when law enforcement came up to the car. Similarly, Johnson testified that Grasle was never unconscious, and that he just "faked like he was hurt."

When Grasle continued to lie motionless in the car after many warnings, Officer Timothy King sent his dog into the vehicle to bite Grasle. When the dog did not do so, the officers carried an unresponsive Grasle out of the car. Schopfer rubbed his knuckles over Grasle's sternum, a technique used to rouse individuals, even though he believed that Grasle was faking. Grasle immediately started screaming for them to get off of him. He continued yelling, pleading with officers not to shoot him, asking where he was, and crying. The officers assured him that they were not going to shoot him and continued asking him to calm down. An EMT arrived and, upon examining Grasle, found no bleeding or bruising other than bruising on his sternum.

On the ride to the hospital, Grasle appeared to be confused and asked repetitive questions. He suggested he thought he was in Afghanistan and did not realize he had been in a car accident. In the hospital, Grasle was not given pain medication because his blood alcohol level was .123. Grasle told a police officer that he was a victim but did not want

to go to the police station and questioned whether he was in custody. Grasle wanted to sign his medical release form and leave the hospital.

At the scene, officers placed Smith and Johnson in separate vehicles and interviewed them separately. They maintained, both at the scene and during later interviews, that Grasle had come up with the robbery plan. During a later search of the vehicle, the police located a gun and the items taken from Seminara's house.

*Grasle's version of events*

Grasle's theory of defense was that he was a victim rather than the mastermind of the robbery. He said he had slept at a friend's house the night before the incident and began drinking vodka as soon as he woke up. During the day he played cards, continued drinking, and made plans to see Seminara later that evening. As the day passed, he got ready to go to Seminara's house and casually mentioned to the other people in the room that he was driving to Overland Park. Grasle agreed to give three men who were there—Johnson, Smith, and Robinson—a ride to their destination in Overland Park. Grasle knew Johnson and Smith as gang members.

Grasle first stopped at Taco Bell and the four men went inside to get something to eat. They got back in the car, but the directions they gave Grasle were vague, and Grasle became frustrated. They stopped at QuikTrip and a liquor store, and Grasle texted Seminara that he would be on his way soon but that he had gotten into a spat with three black guys. Finally, Grasle drove to Seminara's house and figured that the three men could also come and hang out. As they arrived, however, the men told him that the house they wanted to go to was just around the corner. Grasle drove around the corner, dropped the men off, and then went back to Seminara's house. Grasle admitted he was "extremely inebriated" at this point.

Grasle went back to Seminara's house. He could not remember who closed the door or if it was locked, but he assumed he had not done so because his hands were full when he walked in. Grasle and Seminara went into the kitchen where one of Seminara's roommates was cooking. Seminara offered that they could go to the basement, but Grasle did not want to. He wanted to make a sandwich and drink a beer instead. He also felt uncomfortable going to the basement because Seminara had kissed him previously and because of their previous conversations about homosexuality. Suddenly, three men appeared in the doorway of the kitchen, armed with guns. Grasle recognized them as the men he had just dropped off—Robinson, Smith, and Johnson. The armed men made racial and homosexual slurs and ordered Grasle and Seminara to get on the floor. The armed men laughed as they ordered Grasle to get on top of Seminara and "dry hump" him.

The gunmen brought one of Seminara's roommates into the kitchen, and they remained on the floor. Grasle mentioned something about grabbing the weapon to "get control of the situation," but one of the gunman heard him and ordered him to his feet. As Grasle stood, the gunman hit him in the mouth with the gun. Someone grabbed Grasle, placed a gun at his head, and directed him to the garage. The gunmen moved the remaining occupants of the house to a basement bathroom.

Grasle, while lying face down in the garage, heard one of the gunmen tell him he was not their target, saying, "Big homey, this isn't about you. You know. I'm out here doing my thing. This isn't supposed to be about—you know, we can do this the easy way or the hard way kind of stuff." The assailants then put Grasle in the bathroom with the others.

After robbing the house, the men mentioned going to an ATM and made Grasle get in his vehicle to drive them. Grasle became increasingly irritated and exasperated by the men, especially when they commented that they did not know what to do with him

7

next. Grasle suggested that they drop him off in a field, take the battery from his cell phone, and leave in his vehicle but not shoot him. The gunmen never took him to an ATM.

Grasle drove on to I-35 but got off at Shawnee Mission Parkway after one of the occupants saw a police officer following them. Grasle pulled into an IHOP parking lot and slowed to let pedestrians pass in front of the car. He then felt a gun being pressed into his side and heard one of the men order him to keep driving. Grasle left the parking lot and headed toward Antioch Park, a familiar area, while he thought of a plan. The men instructed Grasle to accelerate through the closed gates of the park. Grasle does not remember much after that.

The State charged Grasle with four counts of aggravated robbery, one count of aggravated burglary, and one count of fleeing and eluding. After a jury found him guilty, Grasle's trial was declared a mistrial because the State's closing argument and accompanying PowerPoint presentation had inadvertently been sent with the jury during deliberations.

In his second trial, the jury again convicted Grasle of four counts of aggravated robbery, one count of aggravated burglary, and one count of fleeing or attempting to elude an officer of the law. The jury also found, beyond a reasonable doubt, that the crime (1) was motivated by the sexual orientation of the victim; (2) was motivated by Grasle's belief in the sexual orientation of the victim; or (3) was committed in an especially heinous, atrocious, or cruel manner. The district court granted the State's motion for an upward departure and sentenced Grasle to a total controlling sentence of 391 months. Grasle appeals, raising three claims of error.

*Did the district court err in allowing evidence of Grasle's prior convictions?*

We first examine Grasle's claim that the district court erred by admitting evidence of Grasle's prior convictions. Grasle contemporaneously objected to the admission of this evidence.

During cross-examination, to impeach Grasle, the State introduced some of Grasle's testimony from his first trial. During the first trial, Grasle had testified that he was gay, but he admitted at the second trial that this testimony was false. When asked why he had testified differently before, he said that his attorney from his first trial had told him to do so. At the close of Grasle's redirect examination, Grasle's attorney asked him, "[A]re you telling the truth, the absolute truth today?" Grasle responded, "Yes, ma'am, it's the absolute truth." The district court, over defense's objection, then allowed the State to introduce Grasle's prior convictions for manufacturing, passing, and possessing counterfeit currency, forgery, and passing a bad check. During rebuttal, the State presented the testimony of Grasle's prior attorney. She testified that she had not instructed or advised Grasle to give false testimony.

*Standard of Review*

An appellate court applies a multistep analysis when reviewing a district court's decision on the admission of evidence. First, we determine relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, we determine whether evidence is probative by using an abuse of discretion standard but we use a de novo standard to judge materiality. Second, we determine which rules of evidence or other legal principles apply. On appeal, we review the conclusion de novo. Third, the district court applies the applicable legal rule or principle. Our standard of review of the third step depends on the rule or principle applied: some rules grant the district court discretion while other rules raise matters of law. Finally, an analysis under

K.S.A. 60-445 may be required. Under that statute, a district court may in its discretion exclude evidence when the probative value is substantially outweighed by the risk of unfair surprise to the opposing party. On appeal, we review the district court's determination only for abuse of discretion. *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010).

Grasle does not argue on appeal that evidence of his prior convictions was irrelevant for impeachment purposes, so we need not address the first step of the multistep evidentiary analysis. Under the second step, the parties tacitly agree that K.S.A. 60-421 is the applicable statute governing the admissibility of prior convictions for impeachment purposes. Under the fourth step, Grasle does not argue that the probative value of admitting his prior convictions for impeachment purposes was substantially outweighed by the risk of unfair surprise. Thus, the only step this court must address is the third—whether the district court erred in applying the rules of evidence or legal principles involved.

The district court permitted the State to admit Grasle's prior convictions into evidence under K.S.A. 60-421 because Grasle had placed his credibility in issue. We review that decision for an abuse of discretion. See *State v. Bowers*, 218 Kan. 736, 738-40, 545 P.2d 303 (1976); *State v. Smart*, 26 Kan. App. 2d 808, 811, 995 P.2d 407 (1999). A judicial action constitutes an abuse of discretion if no reasonable person would take the view adopted by the trial court, or its decision is based on an error of law or fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

*Analysis*

Our law permits the State to impeach a defendant with evidence of his or her prior convictions involving dishonesty only in limited circumstances:

10

"Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility. If the witness be the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility." K.S.A. 60-421.

"K.S.A. 60-421 prevents the State from using a defendant's prior convictions for impeachment unless the defendant opens the door by introducing evidence that he or she is credible." *State v. Woolverton*, 284 Kan. 59, 64, 159 P.3d 985 (2007). "The 'open the door' rule applies 'when a defendant opens an otherwise inadmissible area of evidence during the examination of witnesses.' Under the rule, 'the prosecution may then present evidence in that formerly forbidden sphere.' *State v. Johnson*, 258 Kan. 475, 481, 905 P.2d 94 (1995)." *State v. Everett*, 296 Kan. 1039, 1044, 297 P.3d 292 (2013).

A defendant does not place his or her credibility in issue merely by taking the witness stand. *State v. Cook*, 45 Kan. App. 2d 468, 475, 249 P.3d 454 (2011). But when a defendant testifies and emphasizes that he or she knows what it means to take an oath and to tell the truth and he or she is telling the truth, the defendant opens the door to prior convictions under K.S.A. 60-421. *State v. Johnson*, 21 Kan. App. 2d 576, 907 P.2d 144 (1995). See *State v. DeLespine*, 201 Kan. 348, 350, 440 P.2d 572 (1968) (finding a defendant put his character and credibility in issue when he testified that he was an ordained minister and had done charitable works).

The district court relied on *Johnson* when it allowed the State to present evidence of Grasle's prior convictions. There, the defendant testified that he knew what it meant to take an oath and to swear to tell the truth, and that he was telling the truth in his testimony. The *Johnson* court determined that the defendant had "undoubtedly" offered his testimony only to support his credibility as described in K.S.A. 60-461. 21 Kan. App.

11

2d at 579. As a result, the defendant opened the door to the admission of his previous convictions involving dishonesty or false statements. 21 Kan. App. 2d at 579.

Like the defendant in *Johnson*, Grasle assured the jury that he was telling "the absolute truth." Both of Grasle's statements—that he had lied at his first trial because his attorney had told him to, and that he was telling the "absolute truth"—were presented solely to emphasize his then present truthfulness and reliability. Those statements did not relate to any other character trait but truthfulness. By making those statements, Grasle opened a door otherwise shut. His prior convictions for crimes of dishonesty were then admissible for impeachment purposes under K.S.A. 60-421.

Still, Grasle argues that the district court abused its discretion for two reasons. First, he argues that his statement that he lied at the first trial because his previous attorney told him to was not made to portray him as a truthful person, generally, but was made only to show that he was telling the truth during that particular moment. Grasle argues that his admission during his second trial that he had lied at his first trial shows that he did *not* present himself as a truthful person. We disagree. Grasle is confusing character with credibility. Here, as in *Johnson*, the emphasis on truthfulness, even if momentary, was enough to bolster the defendant's credibility as described in K.S.A. 60-421. See *Johnson*, 21 Kan. App. 2d at 579. Cf. *Bowers*, 218 Kan. at 740 (finding defendant's testimony did more than let the jury know who he was so it could properly fit him into the pattern of events; it characterized him as devoutly religious, energetic, cultured, sophisticated, thoughtful and generous, thus opening the door for the State to cross-examine defendant about his prior conviction for burglary and larceny).

Second, Grasle claims that *Johnson* is wrong so we should not follow it. He argues that the *Johnson* court failed to explain how swearing to an oath when one takes the stand, as all witnesses do, is any different from stating at the end of one's testimony that the testimony was true, as Grasle did. But we find *Johnson* to be well-reasoned and

12

follow it here. When a defendant, unsolicited by the prosecution, emphasizes on the witness stand that he or she is telling the truth, that testimony is offered solely to support his or her credibility. As a result, Grasle opened the door to being cross-examined about his previous convictions involving dishonesty or false statements.

A reasonable person would agree with the trial court's decision that Grasle's testimony opened the door to admission of his prior convictions involving dishonesty. We thus find no abuse of discretion.

*Did the district court err in excluding a statement that Grasle was "out cold" after the wreck?*

Grasle next challenges the district court's decision not to admit a statement from an unidentified speaker, overheard on Officer King's body camera, that Grasle looked like he was "out cold" before they removed him from his car. Grasle contends that this evidence would support his theory that he was a victim of the robbery and not its mastermind. But, Grasle contends, if the jury believed that he was deceiving the officers about his condition immediately after the robbery, the jury may be more likely to believe that he was trying to deceive it about his role in the robbery as well. Thus, Grasle's theory depends on the unknown speaker's medical diagnosis of his condition.

During his first trial, Grasle admitted that he "was going too slow to have been" knocked out by the crash and said he was knocked unconscious when Robinson struck him in the head with a gun. But at the second trial, Grasle did not testify that Robinson had hit him. He merely testified that he did not remember much between driving through the park gate and waking up in the hospital, sore and disoriented.

The district court excluded the "out cold" statement from the unknown speaker as hearsay, although it found that the speaker was likely a police officer. It found that even

13

if the excited utterance exception would otherwise apply, the statement lacked sufficient foundation to establish two necessary factors: (1) the speaker's ability to perceive Grasle's injuries, and (2) the speaker's qualifications to comment on Grasle's medical status.

*Standard of Review*

As noted above, an appellate court applies a multistep analysis when reviewing a district court's decision on the admission of evidence. Here, as above, only the third step is at issue—whether the district court erred in applying the rules of evidence or legal principles involved. The relevant rule of evidence here is the hearsay rule and its attendant exceptions. The admission or exclusion of hearsay evidence is within the sound discretion of the trial court. *State v. Stano*, 284 Kan. 126, 131, 159 P.3d 931 (2007). Thus, we will not disturb the trial court's decision absent an abuse of discretion. *State v. Brickhouse*, 20 Kan. App. 2d 495, 501-02, 890 P.2d 353 (1995).

*Analysis*

Evidence of a statement made by someone other than by the witness testifying, offered to prove the truth of the matter asserted, is hearsay. K.S.A. 2017 Supp. 60-460. Hearsay evidence is generally inadmissible unless it falls within a recognized exception. *State v. Stafford*, 296 Kan. 25, 290 P.3d 562 (2012). We agree with the parties that the statement is hearsay, as it was offered by some unknown person to prove the truth of what was said—that Grasle was unconscious. The sole issue is whether the statement should have been admitted under the excited utterance exception.

The excited utterance exception provides:

> "Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:
>
> . . . .
>
> " . . . A statement which the judge finds was made: . . . (2) while the declarant was under the stress of a nervous excitement caused by such perception." K.S.A. 2017 Supp. 60-460(d)(2).

Excited utterances are among certain statements that, by their nature, are made for a purpose other than use in a prosecution and thus should not be barred by hearsay prohibitions. *State v. Bennington*, 293 Kan. 503, 513, 264 P.3d 440 (2011). The statement that Grasle was "out cold" was made by an unknown individual, likely a police officer. We assume this statement was spoken contemporaneously with the events to which it referred and was not a product of retrospective mental action. Instead, the officer who said Grasle was "out cold" apparently made that statement while under the stress of a nervous excitement caused by some perception of Grasle's condition, at some point following a low-speed chase. So the statement would generally be admissible as an excited utterance.

We note the general rule that reliability can be inferred when the evidence falls within a firmly rooted hearsay exception, such as the excited utterance exception. *State v. Deal*, 271 Kan. 483, 23 P.3d 840 (2001). After all, the rationale underlying this exception is that a person demonstrably in the grip of nervous excitement or stress lacks the wherewithal to deliberately fabricate the circumstances causing that excitement or stress. So a person in that frame of mind making a statement about those circumstances may be considered truthful and to that extent reliable. See *State v. Brown*, 285 Kan. 261, 295, 173 P.3d 612 (2007).

But here the problem lies not with the speaker's truthfulness or the statement's general reliability, but with the speaker's opportunity to observe Grasle and the speaker's qualifications to make a medical conclusion or diagnosis. The issue for the jury was whether Grasle was unconscious, as Grasle testified, or was merely faking it, as two officers testified.

Grasle asks us to assume that all officers, including the unknown speaker, had enough medical training to conclude that a person is "out cold." He argues that Officer Schopfer testified he had received training as a first responder to car crashes, so the unknown speaker, who was also an officer, must had had similar training and experience. Grasle relies on *State v. Shadden*, 40 Kan. App. 2d 1103, 1114, 199 P.3d 167 (2010), for the proposition that an officer need not be an expert to testify about his or her observations. But that case properly distinguishes between observations and expert conclusions:

> "'To this end, it is appropriate for the officer to testify that field sobriety tests were administered and that, based upon the officer's training and experience, the driver failed those tests. *It is impermissible to take the additional step of equating a level of certainty or probability to the officer's opinion or to correlate a driver's performance with a specific BAC level.'* [Citation omitted.]
>
> " . . . [H]is testimony that implied a level of scientific certainty in the conclusion that there was a relationship between performance on the walk-and-turn test and an illegal BAC should not have been admitted because a *Frye* foundation had not been laid." *State v. Shadden*, 290 Kan. 803, 829, 235 P.3d 436 (2010).

Similarly, although officers could testify to what they saw—that Grasle was not moving, or was unresponsive—officers could not offer a medical diagnosis of unconsciousness without laying a sufficient foundation, as the district court properly found.

16

Grasle contends that the statement "he's out cold" does not require specific medical training and merely relates to observations of Grasle's physical state. We disagree. The statement did not merely describe Grasle as not moving, but contained an opinion on Grasle's medical condition—his state of consciousness. "Expert testimony is necessary where normal experience and qualifications of lay persons serving as jurors does not permit them to draw proper conclusions from the facts and circumstances of the case." *Pope v. Ransdell*, 251 Kan. 112, Syl. ¶ 3, 833 P.2d 965 (1992). See *McEachern v. Morris*, No. 117,253, 2018 WL 910935 (Kan. App. 2018) (unpublished opinion). Thus, even if all other requirements were met for admission of the statement under an exception to the hearsay rule, the evidence would have still been properly excluded as a matter for expert testimony. A jury could not tell from the mere fact that Grasle was not moving whether he was unconscious. And neither could the unknown speaker, as far as we know from the evidence.

Grasle also challenges the district court's finding that the evidence did not establish the speaker's ability to perceive Grasle. Grasle argues that because the comment was captured on Officer King's bodycam, the district court should have found that the speaker stood close to King and shared his vantage point. But we do not know what the speaker's involvement was, if any, in the events. We cannot tell whether the speaker formed his own opinion or merely repeated a comment he had heard—or whether he based his conclusion on a glimpse of Grasle or based it on his studied conclusion. The evidence does not show whether the statement was based solely on the officer's belief that Grasle was not moving, or on something else. In short, the evidence does not show that the speaker had personal knowledge of the facts on which he based his conclusion. No facts show his conclusion was rationally based on that knowledge. And the expression of his conclusion could mislead or confuse the jury.

We find no abuse of discretion in the district court's decision to exclude this statement as lacking foundation. That the trial court may not have based its decision on

17

exactly the same rationale is not pertinent. "A trial court decision which reaches the right result will be upheld, even though the trial court may have relied upon the wrong ground or assigned erroneous reasons for its decision." *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993).

But even if we assume error, we find it harmless because other evidence showed that Grasle was unconscious when found by the officers. Grasle testified that he remembered driving into the park, but not much from that point until he awoke in the hospital. Officer Schopfer testified that he saw Grasle leaning over the center console, lying there motionless, not responding to any verbal comments from the officers. When officers took Grasle out of the car, Schopfer testified that Grasle's head was down and he was still unresponsive. King testified that he saw Grasle slumped over the center console, motionless, not responding to the officers' commands. Having reviewed the record, we find no reasonable probability that the error, if any, affected the outcome of the trial. See *State v. Gilliland*, 294 Kan. 519, 542, 276 P.3d 165 (2012).

*Did cumulative error affect Grasle's trial?*

Finally, Grasle argues that cumulative error requires reversal of his conviction. Because we have found no abuse of discretion in the district court's rulings about the admission of evidence, we find no cumulative error.

Affirmed.